# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAN LUIS OBISPO MOTHERS FOR
PEACE,

           *Petitioner,*

        v.

NUCLEAR REGULATORY COMMISSION;
UNITED STATES OF AMERICA,

           *Respondents,*

PACIFIC GAS AND ELECTRIC
COMPANY,

       *Respondent-Intervenor.*

No. 08-75058

NRC Nos.
CLI-08-01
CLI-08-05
CLI-08-08
CLI-08-26

OPINION

On Petition for Review of an Order of the
Nuclear Regulatory Commission

Argued and Submitted
November 4, 2010—San Francisco, California

Filed February 15, 2011

Before: Stephen Reinhardt and Sidney R. Thomas,
Circuit Judges, and Jane A. Restani, Judge.*

Opinion by Judge Thomas

---

*The Honorable Jane A. Restani, Judge for the U.S. Court of International Trade, sitting by designation.

**COUNSEL**

Diane Curran, Harmon, Curran, Spielberg & Eisenberg, LLP, Washington, D.C., for the petitioner.

Charles E. Mullins, United States Regulatory Commission, Washington, D.C., for the respondents.

Kathleen M. Sullivan, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, for respondent-intervenor PG & E.

**OPINION**

THOMAS, Circuit Judge:

This petition for review asks us to consider whether, in proceedings under the National Environmental Policy Act ("NEPA"), the United States Nuclear Regulatory Commission ("NRC") must share sensitive security information with parties in a "closed" hearing, when that information is exempted from disclosure by the Freedom of Information Act ("FOIA"). The San Luis Obispo Mothers for Peace ("SLOMFP") contends that the NRC's statutory obligations under NEPA and the Atomic Energy Act ("AEA") require the agency to grant such a hearing. SLOMFP also challenges the adequacy of the NRC's Supplemental Environmental Assessment ("SEA"). We deny the petition.

## I.  BACKGROUND

SLOMFP's petition arises out of NRC proceedings following our remand in *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016 (9th Cir. 2006) ("*Mothers for Peace*"). This time, SLOMFP seeks review of NRC orders: (1) denying requests for a closed adjudicatory hearing on contentions challenging the NRC's decision not to prepare a full environmental impact statement ("EIS") and (2) rejecting, either as inadmissible or on the merits, SLOMFP's various contentions regarding the SEA's adequacy under NEPA.

The factual background of the controversy was set forth in our prior decision, *see Mothers for Peace*, 449 F.3d at 1019-24, and so we shall only briefly review it before turning to post-remand developments relevant to this petition.

### A.  *Mothers for Peace*

In *Mothers for Peace*, SLOMFP and other petitioners sought review of the NRC's approval of a proposed interim spent fuel storage installation ("ISFSI") at the Diablo Canyon Power Plant ("Diablo Canyon") owned by Pacific Gas & Electric Company ("PG & E"). We granted the petition to the extent it challenged the NRC's categorical refusal, as a matter of law, to consider the environmental effects of potential terrorist attacks in its NEPA analyses. *Mothers for Peace*, 449 F.3d at 1028.

In concluding that the NRC had unreasonably interpreted NEPA, we addressed the agency's argument that NEPA's public process was not an appropriate forum for sensitive security issues. 449 F.3d at 1028, 1034-35. While we agreed that "NEPA's requirements are not absolute, and are to be implemented consistent with other programs and requirements," we rejected the assertion that security considerations "result in some kind of NEPA waiver." *Id.* at 1034. Following the Supreme Court's guidance in *Weinberger v. Catholic*

*Action of Hawaii*, 454 U.S. 139 (1981), we observed that "security considerations may permit or require modification of some . . . NEPA procedures" and that a "*Weinberger*-style limited proceeding" may be appropriate on remand, *Mothers for Peace*, 449 F.3d at 1034, but that the NRC's inability to comply with some of NEPA's purposes did not absolve it of its duty to fulfill others. We pointed out, for example, that even where the public cannot access certain information held by the agency, the NRC must nevertheless permit the public to contribute to its decisionmaking process. *Id.*

Accordingly, we deemed the NRC's EA inadequate under NEPA and remanded for further proceedings. *Id.* at 1035.

## B. *Mothers for Peace* **Remand and NRC's Supplemental EA**

On remand, the Commission ordered its staff to prepare a revised EA addressing the likelihood and potential consequences of a terrorist attack at the Diablo Canyon ISFSI site. CLI-07-11, 65 NRC 148 (2007). NRC Staff issued a Draft SEA and Finding of No Significant Impact ("FONSI") in May 2007 and a Final SEA/FONSI in August 2007.[1] The SEA concludes that "the storage of spent nuclear fuel at the Diablo Canyon ISFSI will not have a significant effect on the quality of the human environment." Under 10 C.F.R. § 51.31, therefore, the NRC determined that an EIS was unnecessary.

The SEA expands on the October 2003 EA/FONSI we found inadequate in *Mothers for Peace*. After reviewing the NRC's general post-9/11 security measures and requirements for ISFSIs, the SEA describes the NRC Staff's consideration of the "potential radiological impacts of terrorist acts on spent fuel storage casks," despite the Commission's belief that the probability of such an act is "very low." First, it explains that

---

[1]In November 2007, the NRC amended the Final SEA by adding six reference document titles.

the spent fuel at Diablo Canyon is "adequately protected," due to the resilient design of spent fuel storage cases, largely non-dispersible nature of the nuclear fuel, as well as Diablo Canyon's "location and low profile," which make it "a difficult target for a large commercial airliner." Second, the SEA reviews the NRC's generic analysis of "plausible threat scenarios," such as a large aircraft impact and ground assaults, and it finds that current security measures at ISFSI's are adequate. The NRC's "screening" of threat scenarios "was informed by information gathered through NRC's regular interactions with the law enforcement and intelligence communities."

Next, the SEA describes its dose calculations, which began with a comparison between generic ISFSI assessments and the "relevant features of the Diable Canyon ISFSI." NRC Staff determined that the assumptions in the generic assessments—concerning storage cask design, source term (i.e. amount of radiological material released), and atmospheric dispersion—"were representative, and in some cases, conservative, relative to" Diablo Canyon's "actual conditions." Using inputs from the *generic* assessments, Staff found a "projected dose of less than 5 rem for the nearest resident"; using Diablo Canyon's *site-specific* meteorology and source term "would reduce this projected dose even further." Even under the "most severe plausible threat scenarios" (ground assault and aircraft impact), the NRC projected the dose to the nearest affected resident as "likely . . . well below" 5 rem; in many other scenarios, it would be "substantially less than 5 rem, or none at all."

Responding to public comments, the SEA also notes, *inter alia*, that: (1) the specific threat scenarios and source terms were "sensitive information that cannot be disclosed publicly"; (2) Staff selected "plausible" threat scenarios based on information gathered from federal agencies and the intelligence community; (3) a revised dose estimate, not an "early fatalities" indicator, was used to assess environmental impact;

and (4) while the probability of an attack could not be readily quantified, it could be "qualitatively assessed to be acceptable."

## C.   NRC Proceedings

In a hearing request filed June 28, 2007, SLOMFP submitted five contentions to the NRC, challenging the Draft SEA's adequacy under NEPA. Those contentions remained unchanged by the NRC's Final SEA, published August 30, 2007. SLOMFP requested admission of late-filed Contention 6 on February 27, 2008. SLOMFP's petition for review concerns only Contentions 1, 2, 3, and late-filed Contention 6.

The Commission addressed SLOMFP's initial contentions in CLI-08-01, 67 NRC 1 (2008), by admitting in part Contentions 1(b) and 2 and denying the rest. The NRC admitted Contention 1(b) ("Failure to references sources of scientific data"), insofar as it alleged that Staff failed to provide sources and identify appropriate FOIA exemptions, and ordered staff to prepare a document list and index of FOIA exemptions. The NRC permitted SLOMFP to dispute FOIA claims "based on the index and public record," but, citing *Weinberger*, denied it access to exempt materials. The Commission also admitted Contention 2 ("Reliance on hidden and unjustified assumptions") to the extent it raised concerns that the SEA ignored environmental effects on surrounding land and nonfatal health effects (e.g. latent cancers).

The NRC otherwise denied all contentions. As to the issues raised in this appeal, the NRC denied the following, in whole or in part: Contention 1(a) ("Failure to define terms or explain methodology") because SLOMFP did not show that the SEA was insufficient under NEPA and did not otherwise establish an admissible issue; Contention 2 ("Reliance on hidden and unjustified assumptions") to the extent it reiterated Contention1(b) or alleged a lack of clarity about the mitigating role of emergency planning; Contention 3 ("Failure to consider

credible threat scenarios with significant environmental impacts") because adjudication of "various hypothetical terrorist attacks against Diablo Canyon ISFSI" is "impracticable" and would require "substantial disclosure of classified and safeguards information."

In CLI-08-5, 67 NRC 174 (2008), the NRC responded to admitted Contention 1(b) by directing a presiding officer to review the Staff's FOIA exemptions and the completeness of its reference list. The Commission also rejected SLOMFP's "implicit petition for reconsideration" of its prior refusal (in CLI-08-1) to grant access to FOIA-exempt NEPA documents.

In CLI-08-08, 67 NRC 193 (2008), the Commission declined to admit late-filed Contention 6 ("Inappropriate reliance on the 'Ease' indicator to exclude reasonably foreseeable and significant environmental impacts").[2] The NRC reasoned that Contention 6 was fundamentally similar to Contention 3, which it had previously rejected, and that even if it satisfied the late-filing criteria, the Commission could not litigate the issue without "substantial disclosure" of sensitive information. The NRC again declined to reconsider its refusal to hold a closed hearing.

Finally, in CLI-08-26, 68 NRC 509, following adjudicatory proceedings, the Commission rejected Contention 2 on the merits and concluded that its SEA satisfied NEPA. The NRC explained that SLOMFP offered little evidence concerning effects on surrounding land or non-fatal health effects. Instead, petitioner had "attempted to relitigate" previously-excluded contentions about the NRC's selection of attack scenarios. The Commission also reiterated its reasons for not disclosing sensitive government security information. Neither NEPA nor the Commission's regulations require such disclo-

---

[2]The "Ease" indicator measures the relative difficulty of completing a sabotage scenario, based on simple estimates for time required, complexity, and technology.

sure, the NRC explained, and it "would not assist the [NRC] in determining whether the agency's environmental review was reasonable under NEPA." "[A]ny benefit to be gained in this case from further disclosure is outweighed by the risks inherent in disseminating security-related information, even under protective order."

SLOMFP timely petitioned for review, and we have jurisdiction over the NRC's final orders under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702; the AEA, 42 U.S.C. § 2239(b); and the Hobbs Act, 28 U.S.C. § 2342(4).

## II.   NRC's Refusal to Grant a "Closed" Hearing

**[1]** Throughout the proceedings, SLOMFP sought "identification and access to any security studies or other data relied upon by the NRC in reaching its [FONSI] conclusion." Understanding that its request could involve classified or sensitive information, petitioner sought protected access to these materials in a "closed" hearing. The NRC refused.

**[2]** SLOMFP contends that the NRC's refusal to grant its repeated requests for access to sensitive information in a closed hearing violated NEPA and the AEA. Because NEPA requires the NRC to "engage environmental considerations to the fullest possible extent in its decision-making process," and the AEA entitles parties "to participate in the agency hearing process," SLOMFP believes the NRC violated its statutory obligations and misread the Supreme Court's decision in *Weinberger*.

We disagree. Neither NEPA nor the AEA requires a closed hearing, and the NRC did not abuse its discretion by concluding that holding one would present unacceptable security risks.

### A.   NEPA

**[3]** "[T]he only procedural requirements imposed by NEPA are those stated in the plain language of the Act." *Ver-*

*mont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 548 (1978) ("*Vermont Yankee*"). NEPA contains no hearing requirement. *See Union of Concerned Scientists v. NRC*, 920 F.2d 50, 56 (D.C. Cir. 1990). Nor does NEPA "alter the procedures agencies may employ in conducting public hearings; it instead merely prevents agencies from excluding as *immaterial* certain environmental issues from those hearings." *Id.* (emphasis in original) (internal citation omitted).

SLOMFP contends that a combination of (1) the NRC's NEPA obligation to consider environmental factors and (2) petitioner's statutory rights as an AEA "interested party" nevertheless entitle it to a closed hearing and access to FOIA-exempt documents. As far as NEPA goes, petitioner's argument misreads *Weinberger* and our remand in *Mothers for Peace*.

**[4]** The Supreme Court has explained that NEPA's "twin aims" oblige an agency "to *consider* every significant aspect of the environmental impact of a proposed action" and to "*inform* the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (emphasis added) (internal quotations omitted). These aims are "not necessarily coextensive," however, as NEPA's public disclosure requirements are "expressly governed by FOIA." *Weinberger*, 454 U.S. at 143, 145; 42 U.S.C. § 4332(2)(C).[3] Thus, "in a given situation

---

[3]Section 102(C) of NEPA provides that, "to the fullest extent possible," all federal agencies shall "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement" discussing, *inter alia*, the environmental impact of the proposed action and possible alternatives. 42 U.S.C. § 4332(2)(C). Section 102(2)(C) also requires that the EIS "be made available to the President, the Council on Environmental Quality, and the public," subject to the provisions of FOIA, 5 U.S.C. § 552. *Id.* FOIA, in turn, exempts materials that are properly classified (Exemption 1), related to internal agency personnel rules and practices (Exemption 2), and specifically exempted from disclosure by statute (Exemption 3). *See* 5 U.S.C. § 552(b)(1)-(3). The NRC relied on these exemptions in the proceedings below, and SLOMFP does not contest the agency's FOIA claims. We thus assume, for purposes of this petition, that all documents were properly withheld.

a federal agency might have to include environmental considerations in its decisionmaking process, yet withhold public disclosure of any NEPA documents, in whole or in part, under the authority of an FOIA exemption." *Weinberger*, 454 U.S. at 143; *accord Mothers for Peace*, 449 F.3d at 1034.

**[5]** In *Weinberger*, the Supreme Court held that the Navy was not required to prepare and disclose a "hypothetical" EIS concerning the operation of a Hawaiian facility capable of storing nuclear weapons. 454 U.S. at 143-47. Nearly all information related to storing nuclear weapons was classified, the Court explained, and thus exempt from disclosure under FOIA Exemption 1. *Id.* at 144-45. Because the Navy could neither confirm nor disconfirm that nuclear weapons were stored at the site in question, and therefore whether it even had proposed such storage, the Court held that the Navy's NEPA compliance was "beyond judicial scrutiny." *Id.* at 147. Even had the Navy been required to prepare an "internal" EIS for a proposed project, it need not have disclosed it to the public. *Id.* at 146.

To be sure, this case differs from *Weinberger* in certain respects. Here, it is not the fact of the proposed project (Diablo Canyon ISFSI) that FOIA exempts from disclosure, but rather certain data underlying the NRC's analysis (e.g. classified terrorist attack scenarios). Thus, the Commission's NEPA compliance is not "beyond judicial scrutiny" here—at least, not as it was in *Weinberger*.

**[6]** Still, *Weinberger*'s animating principle applies. As we explained in *Mothers for Peace*, *Weinberger* held "that the Navy was required to perform a NEPA review and to factor its results into its decisionmaking even where the sensitivity of the information involved meant that the NEPA results could not be *publicized or adjudicated*." 449 F.3d at 1034 (emphasis added). The same is true of the FOIA-exempt materials the NRC used in its NEPA process here. The NRC may satisfy NEPA even as it withholds FOIA-exempt materi-

als; it "must consider environmental consequences in its deci-sionmaking process, even if it is unable to meet NEPA's public disclosure goals by virtue of FOIA." *Weinberger*, 454 U.S. at 143, 146.

*Weinberger* did not distinguish "the public at large" from parties to a NEPA hearing, as SLOMFP invites us to do. We decline to second-guess the Commission's determination that closed hearings "could not be conducted in a meaningful way without substantial disclosure of classified and safeguards information." *See, e.g.*, CLI 08-1 at 2. Indeed, in *Mothers for Peace*, we suggested that the NRC could satisfy NEPA by permitting SLOMFP to contribute to the decisionmaking pro-cess without giving petitioner access to sensitive information:

> For example, that the public cannot *access* the result-ing information does not explain the NRC's determi-nation to prevent the public from *contributing* information to the decisionmaking process. The NRC simply does not explain its unwillingness to *hear and consider* the information that Petitioners seek to contribute to the process, which would fulfill both the information-gathering and the public partic-ipation functions of NEPA. [The NRC's security-related] arguments explain why a *Weinberger*-style limited proceeding might be appropriate, but cannot support the NRC's conclusion that NEPA does not apply.

449 F.3d at 1034 (first and third emphasis added).

**[7]** On remand, the NRC recognized its obligation to con-sider all information relevant to its NEPA decision, even as some of the information could be withheld under FOIA or the Commission's statutory obligations to protect national secur-ity information. *See, e.g.*, CLI 08-1 at 2. NEPA does not require the Commission to disclose sensitive information in a closed hearing.

## B.   AEA

**[8]** SLOMFP also urges that NRC's denial of a closed hearing violates the AEA. Having concluded that NEPA does not require such a hearing, our AEA inquiry is straightforward.

**[9]** Section 189(a) of the AEA grants public hearing rights "upon the request of any person whose interest may be affected" by a Commission licensing proceeding. 42 U.S.C. § 2239(a)(1)(A). But "the Act nowhere describes the content of a hearing or prescribes the manner in which this 'hearing' is to be run." *Union of Concerned Scientists*, 920 F.2d at 54. Appellate courts have, accordingly, deferred to the Commission's procedural rules. *See id.*; *see also Pub. Citizen v. NRC*, 573 F.3d 916, 918 (9th Cir. 2009) (noting the "broad responsibility" reposed in the NRC, "free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives" (quoting *Siegel v. AEC*, 400 F.2d 778, 783 (D.C. Cir. 1968))).

Furthermore, as the Commission's final order explains, the AEA's general provisions do not override NEPA's specific non-disclosure provisions. CLI-08-26 at 17. It is a "well-settled rule" of statutory construction that "general and specific provisions, in apparent contradiction, whether in the same or different statutes, and without regard to priority of enactment, may subsist together, the specific qualifying and supplying exceptions to the general." *United States v. Navarro*, 160 F.3d 1254, 1256-57 (9th Cir. 1998) (quoting *Townsend v. Little*, 109 U.S. 504, 512 (1883)).

**[10]** In apparent recognition that the AEA alone does not require a closed hearing, SLOMFP suggests that the requirement derives from NEPA. This NEPA-based argument fails, as we have explained. Neither NEPA nor the AEA requires the "closed hearing" and access to FOIA-exempt documents sought by petitioner. The decision to grant a special hearing

remains in the Commission's discretion, subject to the statutory mandates of NEPA and the AEA.

## C. NRC's Discretionary Judgment

[11] Throughout the proceedings below, the NRC maintained that: (1) information the Commission must *consider* in its NEPA decisionmaking may be withheld from *public disclosure* under FOIA exemptions, under *Weinberger*[4]; (2) the NRC has a statutory obligation under the AEA to protect national security information; (3) meaningful hearings on the range of "conceivable" terrorist scenarios could not be conducted "without substantial disclosure of classified and safeguards information on threat assessments and security arrangements"; and (4) "any benefit to be gained in this case from further disclosure is outweighed by the risks inherent in disseminating security-related information, even under a protective order." *See* CLI-07-11 at 149-151; CLI-08-1 at 2, 5, 9, 15-17, 20-21; CLI-08-5 at 174-177; CLI-08-8 at 193, 196-97, 201-202; CLI-08-26 at 16-23.

[12] The NRC's orders reasonably interpret NEPA, the AEA, and its own regulations. As outlined above, neither NEPA nor the AEA requires a closed hearing. Furthermore, by regulation, the Commission "will not grant access to restricted data or national security information unless it determines that the granting of access will not be inimical to the common defense and security." 10 C.F.R. § 2.905(h). While the orders we review did not expressly reference this regulation, the NRC referred to its statutory duty to protect national security information and concluded that hearings could not be conducted without disclosure of threat assessments and security arrangements, and that the risks of permitting protected

---

[4]The NRC noted that Staff said it had considered credible threat scenarios, even though Staff could not public disclose the details of its analysis. The Commission also indicated that *it* would act as a "check" on the Staff's analysis. *See* CLI-08-1at 21, n.21.

access to FOIA-exempt information outweighed the benefits. See, e.g., CLI-08-1 at 2, 20-21. "We will uphold a decision of less than ideal clarity if," as here, "the agency's path may reasonably be discerned." *Pub. Citizen*, 573 F.3d at 923 (quotations omitted).[5]

[13] It may be that the Commission has procedures for holding the closed hearings SLOMFP seeks, *see* CLI-08-1 at 21, and that petitioner's attorney and expert have the appropriate security clearances. But where no statute or regulatory provision requires such a hearing, the Commission retains discretion over how to balance its duties under NEPA and the AEA. SLOMFP does not contest the NRC's FOIA exemption claims or charge the NRC with violating its own regulations. Under these circumstances, the NRC reasonably determined that holding closed hearings in this and other NEPA/terrorism matters presents substantial risks without an offsetting benefit to its NEPA decisionmaking process.

[14] We are mindful of the Supreme Court's admonition

---

[5]In arguing that the NRC lacks discretion to refuse a closed hearing, SLOMFP relies on *Limerick Ecology Action v. NRC* and *Calvert Cliffs Coordinating Committee, Inc. v. AEA* for the proposition that NEPA compliance is required unless in conflict with other statutory authority. We agree, and we view those cases as quite compatible with our holding that the NRC did not violate NEPA by refusing to hold closed hearings. In the portion of *Limerick Ecology* quoted by petitioner, the Third Circuit held only that the AEA did not "preclude application of NEPA." 869 F.2d 719, 729 (3d Cir. 1989). Likewise, in *Calvert Cliffs*, the D.C. Circuit addressed, in part, a rule precluding consideration of any environmental issue not raised by a party to the hearing. 449 F.2d 1109, 1117 (D.C. Cir. 1971). Here, by contrast, the NRC's orders affirm its obligation to hear and consider all information relevant to its NEPA decisionmaking process, regardless of the Commission's privilege or duty not to disclose some of its analysis. *See* CLI-08-1 at 2; CLI-08-26 at 18-19. Neither *Limerick Ecology* nor *Calvert Cliffs* speak to the NRC's authority in a NEPA proceeding to withhold FOIA-exempt documents, *see Weinberger*, 454 U.S. at 146, or to refuse a "closed hearing," *cf. California Trout v. FERC*, 572 F.3d 1003, 1016-1017 (2009).

against imposing additional procedures on agencies' NEPA decisionmaking. *See Vermont Yankee*, 435 U.S. at 548-49. Instead, we "must determine whether the agency complied with the procedures mandated by the relevant statutes." *Id.* at 549 n.21. The NRC has done so here, and its decision not to provide a closed hearing was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## III.   Adequacy of the SEA

**[15]** In addition to seeking a closed hearing, SLOMFP challenges the SEA's adequacy under NEPA. The essence of its argument is that "the NRC should have considered a group of credible attacks which could result in severe impacts and in fact required preparation of an EIS," and that the Commission failed to do so by improperly selecting terrorist attack scenarios and refusing to consider a scenario presented by SLOMFP. These arguments derive from Contentions 2, 3, and 6 from the proceedings below, and we will organize our discussion accordingly.

We review the NRC's decision to reject a contention for abuse of discretion, *see Limerick Ecology*, 869 F.2d at 749-50, and its "decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Transp'n v. Pub. Citizen*, 541 U.S. 752, 763 (2004) (quoting 5 U.S.C. § 706(2)(A)). "We examine the EA with two purposes in mind: to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no EIS is required is a reasonable conclusion." *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1215 (9th Cir. 2008).

### A.  Contention 2 (Early Fatalities, Latent Health/Land Contamination)

As part of Contention 2, SLOMFP alleges that the NRC screened out attacks that would not cause "early fatalities," thereby excluding scenarios that would cause land degradation or non-fatal illness.[6] In the proceedings, the Commission rejected Contention 2's screening argument and admitted petitioner's concerns about land degradation and non-fatal illness. *See* CLI-08-1 at 17-18.[7]

SLOMFP's "early fatalities" screening argument is not persuasive. That the SEA only provided one indicator of adverse *outcomes* does not establish, as SLOMFP posits, that the Staff "screened out" *attacks* that would not cause immediate fatalities. As the NRC explained, the SEA "mentions early fatalities only in the context of the consideration of the need for additional security measures and . . . goes on to provide dose estimates and other findings in support of its determination." CLI-08-1 at 18.[8] Indeed, the SEA expressly states that the

[6]SLOMFP makes a similar argument concerning the Commission's of the "Ease" formula, under Contention 6, *infra*.

[7]In the proceedings, the Commission admitted SLOMFP's argument that the SEA appeared "silent" on the possibility of land contamination and nonfatal health effects, and later rejected it on the merits. *See* CLI-08-1 at 18; CLI-08-26. The petition for review challenged the NRC's denial on the merits, but SLOMFP waived part of this claim at oral argument. *See Robb v. Bethel Sch. Dist. No. 403*, 308 F.3d 1047, 1054 n.4 (9th Cir. 2002). Counsel explained that petitioner has no interest in a remand concerning whether the SEA adequately describes land and health effects, *unless* the Commission must consider additional terrorist attack scenarios, such as the zirconium fire scenario SLOMFP presented in Contention 3. Because we conclude that the NRC did not abuse its discretion in addressing Contention 3, we do not decide whether a limited remand would be required.

[8]The SEA mentions "early fatalities" in describing the NRC's post-9/11 security review, which investigated the need for additional security measures under such "plausible threat scenarios" as a large aircraft impact and ground assaults. Separately, the SEA explains Staff's use of assumptions from those assessments to calculate Diablo-Canyon-specific doses.

NRC screened "plausible" threat scenarios on the basis of information from law enforcement and intelligence agencies. Staff confirmed this at oral argument, assuring the Commission that "credibility" of attacks, not "early fatalities," was the screening criterion.

**[16]** The Commission did not abuse its discretion when it rejected petitioner's argument that the EA improperly screened its analysis using an "early fatalities" criterion.

## B.  Contention 3 (Zirconium Fire)

In challenging NRC's refusal to admit Contention 3, SLOMFP makes two unsuccessful arguments—that the NRC (1) made an "unlawful threshold determination that any attack on the Diablo Canyon ISFSI is remote and speculative," and (2) improperly failed to address Contention 3 evidence about the possibility of a catastrophic zirconium fire.

SLOMFP's claim that the NRC made an "unlawful threshold determination" misstates the record. Petitioner urges us to read the Commission's initial order as "announcing" that any attacks on Diablo Canyon are remote and speculative. But in the language SLOMFP quotes, the Commission merely reiterated its position *outside of this proceeding* (i.e. in other circuits) that NEPA does not require analysis of terrorist threats. *See, e.g.*, CLI-07-11at 149 n.5; *see, e.g.*, *N.J. Dept. of Envtl. Prot. v. NRC*, 561 F.3d 132 (3d Cir. 2009). As for the NRC's statements about the "impracticab[ility]" of adjudicating alternate terrorist scenarios, they indeed resemble the Commission's arguments in *Mothers for Peace*. This time, though, the NRC performed an analysis in which it made factual determinations as to "plausible" attack scenarios and their consequences.

We also disagree with SLOMFP's suggestion that the NRC had no "reasoned basis" for rejecting petitioner's attack scenario and otherwise failed to address it in the proceedings. In

petitioner's scenario, an attacker ignites a fire in a spent fuel canister, causing the fuel and its cladding to burn as well as the release of radioactive material, resulting in "widespread environmental contamination." SLOMFP "inferred" that the NRC failed to consider this "credible" scenario because the SEA's dose estimates were so small.

[17] The Commission rejected Contention 3 because it was "impracticable" to adjudicate the range of alternate scenarios and because hearings would require "substantial disclosure of classified and safeguards information." CLI-08-1 at 20. While we question the NRC's "impracticability" argument, given its procedures for winnowing admitted contentions, its decision not to litigate Contention 3 on *Weinberger* grounds was reasonable. That decision did not absolve the Commission of its duty to *consider* SLOMFP's evidence, as we have emphasized, but the record shows that the agency did so. Despite its conclusion that the scenarios could not be discussed in a public hearing, the NRC Staff was familiar with the zirconium fire scenarios and assured the Commission that they did not alter the FONSI finding.

Accordingly, the Commission did not abuse its discretion in resolving Contention 3.

### C.   Contention 6 ("Ease" Indicator)

[18] Similar to its "early fatalities" argument in Contention 2, SLOMFP's petition for review maintains that the NRC "screened out" credible attacks by relying on the "Ease" indicator as a proxy for the probability of a threat scenario. SLOMFP raised this point in late-filed Contention 6, which the NRC rejected because SLOMFP failed to show "good cause" and otherwise failed a weighing of the remaining factors under the Commission's late-filed criteria. *See* CLI-08-8 at 200-202. Because SLOMFP fails to challenge that finding, we conclude that the NRC acted within its discretion in declining to admit late-filed Contention 6.

## IV.  CONCLUSION

**[19]**  The NRC's refusal to grant SLOMFP a closed hearing and access to sensitive information was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Neither NEPA nor the AEA requires such a hearing, and the NRC did not abuse its discretion by concluding that holding one would present unacceptable security risks. Furthermore, in its SEA, the NRC considered the relevant factors and reasonably concluded that an EIS is not necessary.

**PETITION DENIED.**